THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MICHAEL GRESHAM, Defendant-Appellant.

Third District   No. 77-423

Opinion filed December 14, 1979.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin and Terry Mertel, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE STOUDER delivered the opinion of the court:

This is an appeal from the circuit court of Peoria County, Illinois, from an order of conviction entered after jury trial. The defendant, Michael Gresham, was convicted of murder.

On February 21, 1977, an ambulance was sent to 2011 Griswald Street, Apt. 536, in Peoria, Illinois. The rescue personnel found a young, three-or four- year-old girl who was unconscious and breathing. Doreen Douglas, mother of the child, told a firefighter at the scene that the child had slipped on water on the floor and hit her head. Later, Douglas stated that she had whipped the child for drinking from the toilet. The child was taken to the hospital.

Officer Eddie Stinson of the Peoria Police Department went to the emergency room where the child had been taken for treatment. After talking to the attending physician and observing the child being treated, Stinson went to the child's home to get clothing for her. There he observed a puddle of water on the living room floor. He also saw an extension cord. Stinson then returned to the hospital where he could not locate the mother of the child, Doreen Douglas. She was later arrested pending further investigation.

At 7:40 p.m. that evening, Stinson received a telephone call from a man identifying himself as the defendant, Michael Gresham. Gresham said he knew his wife, Doreen Douglas, was in custody and she had nothing to do with the child's injuries.

Defendant stated he had inflicted the injuries and was willing to surrender himself, but wanted his wife released when he gave himself up. He was later arrested and gave an oral statement to the police which was reduced to writing the next day.

According to Stinson, during his oral statement the defendant said he "caught her by the neck and started bumping her off the wall, bumping her head on the wall as he did this." He also said he had beaten Darlene previously for drinking out of the toilet.

In the written statement which was entered into evidence at the trial, defendant claimed he returned home after having been drinking. Once home, he was told by his wife that their daughter, Darlene, had been drinking out of the toilet bowl once again. After confronting the child, defendant told her to bring him his belt. Defendant then began striking Darlene with the belt and, although she was crying initially, she stopped. Defendant then went to the closet and got an extension cord and started striking Darlene once again. After she again began crying, defendant put the extension cord down and started pushing her head against the wall. Defendant told her to be quiet, and when she was not, he went to the kitchen to get his belt.

While on his way to the kitchen, Darlene started running away towards the stairs, slipped in a large puddle of water in the living room and fell. She got back up and began running up the stairs and collapsed on about the fourth step. Defendant called her name two or three times, but there was no response. He sent his wife to summon an ambulance and began administering mouth-to-mouth resuscitation until the fire department arrived. Once the emergency equipment arrived, defendant left by the back door.

When he heard that his wife had been arrested, defendant called Officer Stinson and said he was ready to turn himself in.

At the trial, Dr. Patrick Elwood, neurological surgeon at St. Francis Hospital, testified he examined Darlene Douglas on February 21, 1977, and at that time the child was "deeply unconscious" and breathing with the assistance of a respirator. He operated to remove a blood clot near the brain. It was his opinion that whatever caused the blood clot would have been the cause of death. He could not say what caused the hematoma, located on the side of the head, and felt the clot itself was between a few hours and several days old. Darlene never regained consciousness and was maintained on a respirator until her death on February 28, 1977.

Dr. John McGowan, a pathologist, performed the autopsy on Darlene. The cause of death was brain swelling, secondary to trauma. No determination could be reached on when the trauma to the head would have occurred or from what direction.

In McGowan's opinion the child's injuries were caused by blunt trauma and were consistent with striking upon a wall, floor, edge of a step or side of a table.

After the State rested, defendant moved for a directed verdict, based in part on the State's failure to prove causation of death. This motion was denied.

Dr. George Zwicky, a diagnostic radiologist, was called as a defense witness and stated that on February 21, 1977, he examined Darlene Douglas. He testified the subdural hematoma he observed on the patient's right side was not very recent and was at least a day and probably several days old. Swicky did not see the hematoma itself; his determination was made on the basis of X rays.

The defendant then testified on his own behalf. He admitted that he made the statement which was read into evidence and he claimed that rather than pushing the child's head against the wall, he pushed her toward the wall in order to prevent her from stepping in a puddle of water and tracking it through the house. He denied striking her head against a wall, floor, or other blunt object at any time between February 18 and 20.

During the jury instruction conference, defendant argued that the

jury should be instructed on involuntary manslaughter, since if the version of pushing the child against the wall to avoid a puddle were believed, the conduct of defendant would have clearly been reckless. The court refused any instruction regarding involuntary manslaughter, claiming the events established either murder or accident, but nothing else. Defendant also ·unsuccessfully argued the jury should be instructed regarding aggravated battery.

Following a sentencing hearing, the defendant was sentenced to a term of not less than 35 nor more than 75 years.

On appeal, Gresham raises the following issues:

(1) the evidence failed to establish defendant's guilt beyond a reasonable doubt;

(2) the trial court erred in failing to instruct the jury on the lesser included offenses of involuntary manslaughter and aggravated battery; and

(3) based on precedents involving similar factual situations, sentencing a 24-year-old defendant with no prior felony convictions to a term of not less than 35 nor more than 75 years was excessive.

We reverse and remand.

■■ In determining the propriety of the instructions given, we must decide if there was any evidence to support a claim of involuntary manslaughter. The instruction should be given when "there is any evidence which tends to prove the lesser crime." (*People v. Farmer* (1977), 50 Ill. App. 3d 111, 114, 365 N.E.2d 177, 179.) In reaching such a decision, it is important to recall the differences between murder and involuntary manslaughter.

■■ The basic difference between involuntary manslaughter and murder is the mental state which accompanies the conduct causing the homicide. To sustain a conviction for murder, there must be sufficient evidence from which it can be inferred that defendant either intended to kill or knew of the strong probability of death or great bodily harm. Involuntary manslaughter is established when the acts which caused death are done recklessly and a person acts recklessly "* * * when he consciously disregards a substantial and unjustifiable risk * * * and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." (Ill. Rev. Stat. 1977, ch. 38, par. 4—6.) "Thus, the recklessness intended by the statute would indicate that involuntary manslaughter occurs where the acts are performed with a conscious awareness of risk and gross disregard thereof." *People v. Guthrie* (1970), 123 Ill. App. 2d 407, 413, 258 N.E.2d 802, 805. See also Ill. Ann. Stat., ch. 38, par. 4—6, Committee Comments, at 275 (Smith-Hurd 1972).

While a defendant's testimony is often a source as to his mental state, another source is the inferences to be drawn from the character of the defendant's actions. Typically, questions involving the necessity of instructing on involuntary manslaughter often arise when a firearm is the lethal agent and there is evidence that the weapon was not discharged intentionally, but given the surrounding circumstances, the use and presence of a loaded firearm was reckless. Situations can arise however, which preclude any claim of reckless conduct. See *People v. Causey* (1978), 66 Ill. App. 3d 12, 383 N.E.2d 234.

When the death results from the use of nonlethal weapons, such as fists, a somewhat different situation exists. Whereas the intentional use of a deadly weapon is accompanied by a presumption the actor knows his acts create a strong probability of death or great bodily harm because a person intends the natural and probable consequences of his acts, generally, no similar presumption accompanies the striking of an individual with fists, since death is not a reasonable or probable consequence of a blow with a bare fist. (*People v. Crenshaw* (1921), 298 Ill. 412, 131 N.E. 576.) However, if such a blow causes death, it may be involuntary manslaughter. (*People v. Parr* (1976), 35 Ill. App. 3d 539, 341 N.E.2d 439; *People v. Johnson* (1968), 100 Ill. App. 2d 13, 241 N.E.2d 584.) When the use of fists result in death, it may also be murder. (*People v. Freeman* (1966), 78 Ill. App. 2d 242, 223 N.E.2d 444.) Hence, differences between murder and manslaughter involve considerations of degree. *People v. Davis* (1966), 35 Ill. 2d 55, 219 N.E.2d 468.

Such considerations are particularly significant when the evidence is conflicting or is susceptible of more than one inference and non-lethal instrumentalities caused death. When the evidence is conflicting and more than one inference may be reasonably drawn from it, it is the province of the jury to decide whether the accused is guilty of manslaughter or murder if there is any evidence which tends to prove the lesser crime. (*People v. Ryan* (1956), 9 Ill. 2d 467, 138 N.E.2d 516.) As was aptly stated in *People v. Farmer* (1977), 50 Ill. App. 3d 111, 116, 365 N.E.2d 177, 180:

> "It matters not that defendant's testimony was impeached, contradicted and inconsistent with a prior statement concerning the incident. * * *
>
> The jury need not accept defendant's version of the story where there is ample evidence to support the murder conviction, but the choice is for the jury not the court and if there is any evidence in the record, no matter how weak or inconsistent with the rest of the record, the jury should be given the instruction on the lesser offense."

We believe the present case is one in which it was for the jury to decide whether the crime was murder, involuntary manslaughter,

accident or a homicide not caused by the defendant. According to Officer Stinson, the defendant in his oral statement said that he "caught her by the neck and started bumping her off the wall, bumping her head on the wall as he did this." It appeared the defendant had been drinking heavily prior to and at the time of the incident and was also intoxicated to some extent at the time of the oral statement to Stinson. In fact Stinson testified that questioning was cut off because of the defendant's drunkenness. Defendant denied making the oral statement to the officer. In his written statement, the defendant said he "pushed" the victim's head against the wall. In his testimony the defendant acknowledged making the written statement read into evidence, but claimed that rather than pushing the victim's head against the wall, he pushed her toward the wall in order to prevent her from stepping in a puddle of water and tracking it through the house. Defendant denied striking the victim's head against a wall, floor or other blunt object.

The oral statement and written statement were presented by the prosecution in support of the charge of murder, and of course the defendant's testimony was presented in his own defense. The two statements presented by the prosecution are the principal evidence the defendant caused the death of the victim and they differ significantly both in express terms and in the inferences which may be drawn from the language employed. It depends on how one views the defendant's account of his conduct in these statements as to whether the acts constituted a strong probability of death or whether the conduct was merely reckless. When the defendant's testimony is considered with his prior statements as well as with the medical evidence, additional conflicting inferences may be drawn. The trial court in considering the evidence as it related to the involuntary instruction seems to have believed the various statements and testimony were neither pure murder nor pure accident but rather than accepting the fact that inferences of recklessness were possible, as we believe they were, the court ultimately refused to give the instruction. While the medical testimony clearly established death resulted from a subdural hematoma, the nature and character of the injury suggested several alternatives as to the source of the hematoma. Such testimony indicated such an injury can result from the head being struck with a hand or fist; the head striking a wall, a floor, the side of a table or anything flat; falling while walking and hitting your head; falling against a wall without any assistance; or the head being hit against a wall. Dr. McGowan, the pathologist who performed the autopsy, believed this to be a rather common type of injury. When the defendant's oral statement, which he denied, his written statement and his testimony at trial are all considered in light of the nature of the injury and the medical testimony, we believe the jury would be warranted in

concluding that the incident was murder, involuntary manslaughter, or accident, depending on how the conflicting inferences were resolved.

Our decision is not without further support. In *People v. York* (1978), 57 Ill. App. 3d 243, 373 N.E.2d 90, the court affirmed the defendant's conviction for involuntary manslaughter for the death of a four-year-old boy. The victim's death resulted from what could best be described as child beating. In *People v. Bartell* (1944), 386 Ill. 483, 54 N.E.2d 700, the defendant was charged and tried for the murder of his 21-month-old daughter. The jury found him guilty of manslaughter. Evidence was introduced to show that the death occurred as the result of the defendant repeatedly slapping the child. The defendant's conviction was affirmed on appeal.

While these cases do not involve issues relating to instructions, they do demonstrate that a homicide caused by child abuse can be involuntary manslaughter. (See generally Annot., 89 A.L.R.2d 396 (1963).) We believe the trial court erred in refusing to give the appropriate instruction on involuntary manslaughter and the cause must be remanded for a new trial.

Although the defendant urges the offense of murder was not proved beyond a reasonable doubt, what we have heretofore said disposes of this issue. From the foregoing discussion we have concluded that the evidence is subject to the inference of the appropriate mental state for murder depending on how the conflicts in the evidence are resolved. In an analogous case, *People v. Kinzell* (1969), 106 Ill. App. 2d 349, 245 N.E.2d 319, contentions similar to those presented here were rejected, and the defendant's conviction for murder of an eight-month-old boy was upheld. ▇ As to the defendant's assertion that the trial court erred in refusing to give an instruction on aggravated battery, we are of the opinion that such ruling was correct. Where evidence in the case established that victim was killed and not merely subjected to bodily harm, refusal to instruct jury on aggravated battery as a lesser-included offense of murder is not error. *People v. Johnson* (1975), 32 Ill. App. 3d 36, 335 N.E.2d 144.

For the foregoing reasons the judgment of the circuit court of Peoria County is reversed and the cause remanded for further proceedings consistent with the views expressed herein.

Reversed and remanded.

BARRY and SCOTT, JJ., concur.